CEIVED DEC 14 1995

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

---

FIRST PRESBYTERIAN CHURCH OF MANKATO, MINNESOTA and KIRSTEN ORVICK,

Plaintiffs,

v.

JOHN G. KINNARD & COMPANY, INCORPORATED and GARY LEFKOWITZ,

Defendants.

CIVIL FILE NO. 3-94-1024

# ORDER FOR FINAL JUDGMENT

WHEREAS, the parties to the above-described class action (the "Litigation") executed a Settlement Agreement on September 29, 1995 (the "Settlement Agreement"); and

WHEREAS, on October 16, 1995, the Court ordered that this action proceed as a class action with the following certified Settlement Class:

> All persons and entities who purchased limited partnership interests and/or interests in First Secured Mortgage Investors ("FSMI") programs sponsored by Citi-Equity Group, Inc. ("CEG") and/or CEG affiliates between September 1, 1987, and May 6, 1994, inclusive. Excluded from the Settlement Class are (i) John G. Kinnard and Company, Incorporated ("JGK"), Kinnard Investments, Inc. ("KINNARD"), Gary Lefkowitz, any affiliates or subsidiaries of JGK, any



DEC 12 1995

EXHIBIT G

> affiliates or subsidiaries of CEG, the officers and directors of JGK ("Excluded Persons"); (ii) any entity in which any Excluded Person has a controlling interest; (iii) any legal representatives, heirs, successors and assigns of any of the foregoing persons, except that the employees of JGK who are not officers or directors of JGK may participate in this settlement; and (iv) any other parties to any of the Lawsuits except the members of the Settlement Class;

and

WHEREAS, John G. Kinnard and Company, Incorporated ("JGK") and the Plaintiff Class (collectively, the "Parties") in this Stipulation, applied for an Order pursuant to Rule 23(e) of the Federal Rules of Civil Procedure preliminarily approving a proposed settlement of the class action in accordance with the Settlement Agreement entered into by the Parties as of September 29, 1995. The Settlement Agreement was preliminarily approved by the Court by Order dated October 16, 1995. That Order also approved the plan of allocation and the forms of notice of the settlement to Plaintiff Class Members, directed that appropriate notice of the settlement be given to Plaintiff Class Members and set a hearing date for final approval of the settlement; and

WHEREAS, notice of the settlement was mailed to Plaintiff Class Members on or before October 20, 1995; and

WHEREAS, on December 5, 1995, at 2:00 p.m., at the United States District Court, District of Minnesota, Federal Building, 316 North Robert Street, St. Paul, Minnesota 55101, the Court held a hearing on whether the settlement was fair, reasonable,

adequate and in the best interests of the Plaintiff Class, and JGK (the "Settlement Hearing"); and

WHEREAS, Plaintiffs' counsel filed with the Court a list of Citi-Equity investments sold through JGK and a revised estimate of the loss (expressed in terms of a percentage) based on the best current information available, which will be used in calculating the recovery claimants will receive; and

WHEREAS, based upon the foregoing, having heard the statements of counsel for the Parties and of such persons as chose to appear at the Settlement Hearing; having considered all of the [illegible] Litigation, the benefits to the Class under the Settlement and the risks, complexity, expense and probable duration of further litigation; and being fully advised in the premises;

THE COURT HEREBY FINDS AND CONCLUDES that:

A. This Court has jurisdiction over the subject matter of the Litigation.

B. The form, content and method of dissemination of the notices given to Plaintiff Class Members who could be identified through reasonable effort, were adequate and reasonable and constituted the best notice practicable under the circumstances.

C. The notices, as given, complied with the requirements of Rule 23 of the Federal Rules of Civil Procedure, satisfied the requirements of due process and constituted due and sufficient notice of the matters set forth therein.

D. The settlement set forth in the Settlement Agreement is fair, reasonable, adequate and in the best interests of the Plaintiff Class and JGK.

E. The Representative Plaintiffs and their counsel fairly and adequately represent the interests of the Plaintiff Class Members in connection with the settlement.

F. The Representative Plaintiffs and the Plaintiff Class Members, and all and each of them, are hereby bound by the terms of the settlement set forth in the Settlement Agreement.

G. The provisions of the Settlement Agreement, including definitions of the terms used therein, are hereby incorporated by reference as though fully set forth herein.

NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED that:

1. The settlement set forth in the Settlement Agreement is fair, reasonable, adequate and in the best interests of the Plaintiff Class and the defendants, and it shall be consummated in accordance with the terms and provisions of the Settlement Agreement.

2. Judgment shall be, and hereby is, entered dismissing the Litigation between the Plaintiff Class and each of the Representative Plaintiffs on the one hand and JGK on the other hand, with prejudice, on the merits and without taxation of costs in favor of or against any party. Any proceeding or order, or any appeal or petition for a writ of certiorari pertaining solely to any application for or award of attorneys' fees, costs or

expenses shall in no way delay or preclude the judgment from becoming Final.

3. Each Representative Plaintiff and each Plaintiff Class Member who has not submitted a timely and proper request for exclusion from the Class is hereby conclusively deemed to have released (a) John G. Kinnard and Company, Incorporated, a Minnesota corporation, and all and each of its predecessors, successors, subsidiaries, parents, affiliates and related corporations and entities, and all and each of its and their current and former officers, directors, shareholders (other than members of the Plaintiff Class), employees, agents, registered representatives, attorneys, representatives, assigns, partners, principals and insurers; and (b) Kinnard Investments, Inc., its affiliated corporations, [illegible] subsidiaries (including but not limited to JGK), current and former employees agents, representatives, officers, directors, attorneys and "controlling persons" as that term or concept is used in the Securities Act of 1933 or in the Securities and Exchange Act of 1934 or in any state securities laws or regulations, with respect to any and all claims which any of them had arising out of, relating to or in any way connected with (a) the purchase during the Class Period of any Citi-Equity interests by a Plaintiff Class Member; and (b) any of the facts, circumstances, transactions, events, occurrences, acts, omissions or failures to act that are alleged or referred to in the Litigation. A list of

those who have timely excluded themselves from the Class is attached to this Order as Exhibit A.

4. All Plaintiff Class Members are hereby permanently enjoined and barred from instituting, asserting or prosecuting, either directly, representatively, derivatively or in any other capacity, any and all claims which the Plaintiff Class Members, or any of them, had, have or may in the future have against the defendants, or any of them, arising out of, based upon or otherwise related to the Settled Claims.

5. Counsel for Representative Plaintiffs are hereby awarded a fee from the Settlement Fund created by the settlement in this matter equal to thirty-three and one-third (33.33%) percent of the gross settlement funds received from each of the payments of cash, MCA Certificates and Warrants, including interest earned on said funds. Additionally, counsel for the Representative Plaintiffs are hereby awarded expert fees, costs and expenses in the amount of $82,318.84. These amounts are to be paid to the Chestnut & Brooks, P.A. Trust Account for further distribution as Settlement Counsel and Plaintiffs' Lead Counsel may determine.

The following named Plaintiff Class Representatives are hereby awarded from the Settlement Fund the sum of $2,000.00 each as compensation for their time and service as Class Representatives: First Presbyterian Church of Mankato, Minnesota; Kirsten Orvick; Charles Fischer; Bernice Fischer; Community Bank

of Cleveland; David Levi; Mabel Levi; James Klasse; Margaret Klasse; Charles A. Schmid; Lloyd Harris; Francine Harris; Lynn Sternitzke; Thomas Singer; William D. Sell; Althea M. Sell; John P. Graham; Shirley M. Graham; Harley Dunham; Shirley Dunham; L, M & R Investors; James G. Olexa; Irv Hansen and Dale Palm.

Expenses of administering this settlement shall be paid from the Settlement Fund. A reserve to handle future contingencies shall be established in the amount of $25,000.00.

6. The Court, without affecting the finality of this Order for Final Judgment, hereby retains and reserves jurisdiction over (a) implementation of the settlement and any distributions to Authorized Claimants under the terms and conditions of the Settlement Agreement and pursuant to further orders of this Court; (b) disposition of the Settlement Fund under the terms and conditions of the Settlement Agreement and notices; (c) the Litigation, until (i) the Effective Date contemplated by Paragraph B.4 of the Settlement Agreement, which will occur on the date upon which this judgment becomes not subject to further appeal or review, and (ii) each and every act agreed to be performed by the Parties shall have been performed pursuant to the terms and conditions of the Settlement Agreement, including the exhibits annexed thereto; (d) the Litigation, for the purposes of implementing distribution to shareholders in accordance with the notice; and (e) all Parties, for the purpose of enforcing and administering the Settlement Agreement and settlement.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: Dec 11, 1995

The Honorable Michael J. Davis
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
THIRD DIVISION

IN RE CONTROL DATA CORPORATION SECURITIES LITIGATION

MASTER FILE NO. 3-85-1341

(This Order also relates to File No. 3-85-1269)

ORDER FOR FINAL JUDGMENT

WHEREAS, the parties to the above-described class action and derivative litigation (the "Litigation") entered into Stipulations of Settlement as of February 19, 1993, and July 11, 1994 (the "Stipulations" or "Settlements"); and

WHEREAS, on December 1, 1986, the Court ordered that this action proceed as a class action with the following certified class:

> To the extent that they have claims under federal law, all persons or entities who purchased common stock of Control Data Corporation in the open market during the period beginning January 7, 1985, and ending August 6, 1985, excluding defendants, subsidiaries and affiliates of the corporate defendant, members of the immediate families of the individual defendants and the successors or assigns of any of the defendants;

and

WHEREAS, Ceridian Corporation, formerly known as Control Data Corporation ("CDC"), the Individual Defendant directors and officers, and the Plaintiff Class and Derivative Plaintiffs

FILED SEP 2 3 1994
FRANCIS E. DOSAL, CLERK
Judgment Ent'd. SEP 2
Deputy Clerk's Initials

EXHIBIT H

(collectively, the "First Parties") in the Litigation, applied for an Order pursuant to Rules 23(e) and 23.1 of the Federal Rules of Civil Procedure preliminarily approving a proposed partial settlement of the class and derivative actions in accordance with a Stipulation of Settlement (the "First Stipulation" or "First Proposed Settlement") entered into by the First Parties on February 19, 1993. The First Stipulation was preliminarily approved by the Court by Order dated February 25, 1993; and

WHEREAS, KPMG Peat Marwick, formerly known as Peat Marwick Main & Co. ("PMM") and the Plaintiff Class and Derivative Plaintiffs (collectively, the "Second Parties") in the Litigation applied for an Order pursuant to Rules 23(e) and 23.1 of the Federal Rules of Civil Procedure preliminarily approving a proposed partial settlement of the class and derivative actions in accordance with a Stipulation of Settlement (the "Second Stipulation" or "Second Proposed Settlement") entered into by the Second Parties on July 11, 1994. The Second Proposed Settlement was preliminarily approved by the Court by Order dated July 12, 1994. That Order also approved as to both the First and Second Proposed Settlements the plan of allocation and the forms of notice of the settlements to Plaintiff Class Members and current shareholders of Ceridian Corporation, directed that appropriate notice of settlements to be given to Plaintiff Class Members and current shareholders of Ceridian Corporation and set a hearing date for final approval of the settlements; and

WHEREAS, for the purposes of this Order, the First and Second Parties will be referred to herein collectively as the "Parties" and the First and Second Stipulations or the First and Second Proposed Settlements will be referred to herein collectively as the "Stipulations" or "Settlements;" and

WHEREAS, notice of the Settlements was mailed to Plaintiff Class Members and current shareholders of Ceridian Corporation on July 19 and July 26, 1994, respectively, and a summary notice of the Settlements was published in the national edition of The Wall Street Journal on July 29, 1994; and

WHEREAS, on September 21, 1994, at 9:30 a.m., at the United States District Court, District of Minnesota, 110 South Fourth Street, Minneapolis, Minnesota 55401, the Court held a hearing on whether the Settlements were fair, reasonable, adequate and in the best interests of the Plaintiff Class, CDC and PMM (the "Settlement Hearing"); and

WHEREAS, based upon the foregoing, having heard the statements of counsel for the Parties and of such persons as chose to appear at the Settlement Hearing; having considered all of the files, records and proceedings in the Litigation and being fully advised in the premises,

THE COURT HEREBY FINDS AND CONCLUDES that:

A. This Court has jurisdiction over the subject matter of the Litigation.

B. The form, content and method of dissemination of the notices given to Plaintiff Class Members and current shareholders of Ceridian Corporation, including both published notice and individual notice to all Plaintiff Class Members and current

shareholders of Ceridian Corporation who could be identified through reasonable effort, were adequate and reasonable and constituted the best notice practicable under the circumstances.

C. The notices, as given, complied with the requirements of Rule 23 of the Federal Rules of Civil Procedure, satisfied the requirements of due process and constituted due and sufficient notice of the matters set forth therein.

D. The Settlements set forth in the Stipulations are fair, reasonable, adequate and in the best interests of the Plaintiff Class, CDC and PMM.

E. The Representative Plaintiffs and their counsel fairly and adequately represent the interests of the Plaintiff Class Members and Derivative Plaintiffs in connection with the Settlements.

F. The Representative Plaintiffs, Derivative Plaintiffs and the Plaintiff Class Members, and all and each of them, are hereby bound by the terms of the Settlements set forth in the Stipulations.

G. The provisions of the Stipulations, including definitions of the terms used therein, are hereby incorporated by reference as though fully set forth herein.

NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED that:

1. The Settlements set forth in the Stipulations are fair, reasonable, adequate and in the best interests of the Plaintiff Class and Derivative Plaintiffs, CDC and PMM, and they shall be consummated in accordance with the terms and provisions of the Stipulations.

2. Judgment shall be, and hereby is, entered dismissing the Litigation with prejudice, on the merits and without taxation of costs in favor of or against any party.

3. All Plaintiff Class Members and Derivative Plaintiffs are hereby conclusively deemed to have released (a) Ceridian Corporation, formerly known as Control Data Corporation, a Delaware corporation, and all and each of its predecessors, successors, subsidiaries, parents, affiliates and related corporations and entities, and all and each of its and their present, former and future officers, directors, shareholders (other than members of the Plaintiff Class), employees, agents, attorneys, representatives, assigns, partners, principals and insurers; (b) William C. Norris, Robert M. Price, Marvin G. Rogers and Norbert R. Berg, all and each of them, and all and each of their respective assigns, successors, agents, representatives, heirs, executors, administrators and insurers; and (c) KPMG Peat Marwick, formerly known as Peat Marwick Main & Co., a partnership, and all and each of its partners, officers, directors, predecessors, successors, subsidiaries, parents, affiliates and related entities, with respect to any and all claims, known or unknown, suspected or unsuspected, fixed or contingent, and whether or not concealed or hidden (as defined in Paragraphs VIII(B) and X of the First Stipulation and Paragraphs VII(B) and IX of the Second Stipulation), which exist or may in the future exist against any of the Defendants by reason of any matter, event, cause or thing whatsoever arising out of, relating to or in any way connected with (a) the ownership, purchase, sale

or other acquisition or disposition during the Class Period of any CDC securities by a Plaintiff Class Member; (b) the status of a Plaintiff Class Member or Derivative Plaintiff as a shareholder of CDC during the Class Period; and (c) any of the facts, circumstances, transactions, events, occurrences, acts, omissions or failures to act that are or could have been alleged or referred to in the Litigation. This release is intended to be a "Pierringer" release that allows the released parties to enter into this final settlement with the knowledge and peace of mind that the amount hereby paid to the Settlement Fund is the total amount which the released parties will ever pay, either to the Settlement Fund (on behalf of Plaintiffs and the Class, as stipulated), or to any other person including, without limitation, as contribution or indemnification with respect to the Settled Claims, and enables the released parties to seek and obtain final dismissal as any kind of party defendant (including third-party defendants, defendant in cross-claim or defendant in any action for contribution or indemnification), with respect to any settled claim.

4. All Plaintiff Class Members and Derivative Plaintiffs are hereby permanently enjoined and barred from instituting, asserting or prosecuting, either directly, representatively, derivatively or in any other capacity, any and all claims which the Plaintiff Class Members or Derivative Plaintiffs, or any of them, had, have or may in the future have against the Defendants, or any of them, arising out of, based upon or otherwise related to the Settled Claims.

5. Counsel for Representative Plaintiffs are hereby awarded a fee from the Class Settlement Fund created by the Settlements in this matter equal to $2,957,267.00 (36.96%) percent of the gross settlement funds, including interest, to be distributed to Plaintiff Class Members. Additionally, counsel for the Representative Plaintiffs are hereby awarded expert fees, costs and expenses in the amount of $1,042,733.00. These amounts are to be paid to the Chestnut & Brooks, P.A. Trust Account for further distribution as Plaintiffs' Lead Counsel may determine.

The listed Plaintiff Class Representatives John Page, Bill Randall, William Steiner and A. David Weisgal are hereby awarded from the Class Settlement Fund the sum of $5,000.00 each as incentive compensation.

Expenses of administering these Settlements shall be paid from the Class Settlement Fund. A reserve to handle future contingencies shall be established in the amount of $50,000.00.

6. The Court hereby retains and reserves jurisdiction over (a) implementation of the Settlements and any distributions to Authorized Claimants under the terms and conditions of the Stipulations and pursuant to further orders of this Court; (b) disposition of the Class Settlement Fund under the terms and conditions of the Stipulations and notices; (c) the Litigation, until (i) the Effective Date contemplated by Paragraph I(11) of the First Stipulation and Paragraph I(H) of the Second Stipulation, which will occur on the date upon which this judgment becomes not subject to further appeal or review, and (ii) each and every act agreed to be performed by the Parties shall have been performed pursuant to the terms and conditions of

the Stipulations, including the exhibits annexed thereto; (d) the Litigation, for the purposes of implementing distribution to shareholders in accordance with the notice; and (e) all Parties, for the purpose of enforcing and administering the Stipulations and Settlements.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: September 21st, 1994

The Honorable James M. Rosenbaum
United States District Judge

United States District Court, D. Minnesota.

In re EMPLOYEE BENEFIT PLANS SECURITIES LITIGATION.

Civ. No. 3-92-708.

June 2, 1993.

OPINION

KYLE, District Judge.

Introduction

***1** The above-entitled matter (the "Litigation") is a shareholder class action brought by certain holders of the common stock of defendant Employee Benefit Plans, Inc. ("EBP"). Now before the Court are plaintiffs' Application For Final Approval of Settlement and Joint Application for Awards of Attorney's Fees and Costs and Incentive Bonuses for the Named Plaintiffs.

Background

A. Background of the Litigation

On or about January 10, 1992 the common stock of defendant Employee Benefit Plans, Inc. ("EBP"), then publicly traded on the New York Stock Exchange, dropped 50% in price. Thereafter, certain EBP shareholders contacted plaintiffs' counsel [FN1] and stated their concerns about the sudden drop in price; plaintiffs' counsel began an investigation into the available facts surrounding the price drop.

Following counsel's factual investigation, including an examination of EBP's preparation and issuance of a series of public statements about its business practices, prospects, and financial performance, plaintiffs filed three separate actions in this Court in mid-January, 1992. [FN2] Each of the plaintiffs therein brought claims on behalf of themselves and certain other purchasers of EBP common stock against EBP and William Sagan, Robert Brook, and Michael Goran, officers and/or directors of EBP (collectively the "defendants"). Specifically, plaintiffs alleged that certain of EBP's public statements were materially misleading misstatements and constituted violations of section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78i, and common law fraud.

The three individual actions were consolidated by entry of Pretrial Order No. 1 on March 10, 1992. On April 8, 1992 plaintiffs filed a consolidated complaint ("Consolidated Complaint"), alleging class claims against the defendants, to wit: violations of section 10(b) of the 1934 Act, common law fraud, and negligent misrepresentation. Plaintiffs followed the filing of the Consolidated Complaint with a set of document requests and several subpoenas calling for custodial depositions of and document productions by certain third party insurance companies.

Thereafter, the defendants filed, pursuant to Fed.R.Civ.P. 9(b) & 12(b)(6), a Motion to Dismiss the Consolidated Complaint. After a full briefing and argument on the motion, the Court denied defendants' motion as to the section 10(b) claim and granted the motion as to the plaintiffs' common law claims. [FN3] Thereupon, the defendants filed separate answers to the complaint, denying plaintiffs' allegations and asserting scores of affirmative defenses.

The discovery process in this matter was, for its somewhat short tenure, contentious. In pursuit of both sides' discovery desires, the parties engaged in repeated negotiations designed to achieve agreement on, *inter alia,* document production, depositions, and a protective order governing discovery. In addition, the defendants brought a motion to stay discovery and for a protective order, while plaintiffs brought a motion to compel discovery. Both motions were briefed and argued before United States Magistrate Judge Franklin L. Noel, who denied the motions in an order dated July 9, 1992. Eventually, at least 100,000 pages of EBP documents were produced to and reviewed by plaintiffs' counsel.

***2** On October 26, 1992 plaintiffs filed a Motion for Class Certification. Following the transfer of this action to this Court, the Motion was scheduled for argument before the undersigned on February 2, 1993. A tentative settlement was reached prior to the date on which the defendants' responsive brief was to be filed.

B. The Settlement

Settlement discussions commenced in October of 1992. After several weeks of negotiations, a tentative agreement to settle the litigation was

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT I

reached by all of the parties. Eventually, the parties memorialized the agreement in a Memorandum of Understanding ("MOU"), the final version of which was executed on December 16, 1992.

During the succeeding three months, the parties engaged in additional discussions and negotiations, eventually agreeing on the terms and conditions of settlement. The settlement was memorialized in a Stipulation of Settlement ("Stipulation").

All parties came before this Court on March 16, 1993, seeking an order preliminarily approving the settlement (as set forth in the Stipulation and exhibits thereto), and approving forms of long and summary Notice, a Proof of Claim and Release Form and a Depository Agreement. On that same date, the Court granted preliminary approval and ordered that notice be given to the class.

Following preliminary approval of the settlement, plaintiffs' counsel, through a claims administration firm prepared and mailed notice of the settlement (the "Notice") and Proof of Claims Forms. [FN4] *See* Hoyt Aff. The claims administrator also published the summary form of notice in the April 8, 1993 *Wall Street Journal* National Edition.

C. The Settlement Fund

The proposed settlement provides for settlement of all class claims against all defendants, in exchange for financial remuneration in the amount of $10.7 million, paid into a fund ("Settlement Fund"). The Settlement Fund includes both a cash payment and a debenture. [FN5] The cash payment component totals $4.2 million, and is to be paid into a class escrow account ("escrow account"). [FN6] On February 12, 1993, $3 million was paid in the escrow account by EBP's insurance carrier. Upon entry of an order of final judgment, EBP will pay an additional $1.2 million in cash into the escrow account. [FN7]

The debenture is a six and three-quarter percent (6-3/4 %) convertible senior subordinated debenture in the principal amount of $6.5 million, due three years and forty days after issuance. [FN8] Interest is to be paid semi-annually to plaintiffs' counsel, [FN9] who will hold interest payments going to the class in trust pending payment of the debenture's principal.

The debenture's conversion feature permits plaintiffs' co-lead counsel, at their option, to convert the principal and any unpaid interest into EBP common stock at any time until maturity at a price of sixteen dollars ($16.00) per share. [FN10]

In addition, plaintiffs' counsel also has the one-time option to "put" the entire debenture to EBP at par for immediate payment of principal and all accrued unpaid interest, if at any time prior to the debenture's maturity, EBP's outstanding indebtedness exceeds an aggregate of $40 million. [FN11]

D. The Class

*3 Under the Stipulation, the parties have established that the class period runs from October 15, 1991 through October 9, 1992, inclusive (the "Class Period"). The class of plaintiffs ("Settlement Class") is divided into the following two subclasses:

> *Subclass One.* Settlement Class members who purchased their shares during the period October 15, 1991 through January 9, 1991, inclusive; and *Subclass Two.* Settlement Class members who purchased their shares during the period January 10, 1992 through October 9, 1992, inclusive.

The two subclasses were created because plaintiffs alleged that although most of the adverse information regarding EBP was disclosed on January 10, 1992, such disclosures were partial; EBP continued to disclose additional adverse information until at least October 9, 1992. Hence, those persons purchasing EBP stock on or before January 10, 1992 had no notice of EBP's alleged wrongdoing, whereas those persons purchasing stock after January 10, 1992 had some notice. Accordingly, seventy-five percent (75%) of the net settlement proceeds will be distributed on a *pro rata* basis to authorized claimants in Subclass One. [FN12] The remaining twenty-five percent (25%) of the net settlement proceeds shall be similarly distributed to authorized claimants in Subclass Two.

The Settlement Fund will be used to compensate each authorized claimant for the claimant's "Recognized Loss." The Recognized Loss will be calculated as follows:

> Recognized loss is the purchase price, excluding commissions, less either (a) the sale price, excluding commissions, for those shares sold on or before October 9, 1992, or (b) $13.00 per share, the average closing price for the five days after the end of the settlement class period, for those shares held at the close of business on October 9, 1992.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Discussion

I. Plaintiffs' Motion For Final Approval of Settlement

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of class action settlements; however, Rule 23(e) does not establish any standard for determining whether a settlement should be approved. Notwithstanding the lack of statutory guidance, judicial application of Rule 23(e) has firmly established that the issue for determination is whether the settlement is "fair, adequate and reasonable," that is, does it protect the interests of the class members, and whether the settlement is the product of fraud or collusion. *Van Horn v. Trickey,* 840 F.2d 604, 606 (8th Cir.1988); *In re Flight Transp. Corp. Sec. Litig.,* 730 F.2d 1128, 1135 (8th Cir.1984), *cert. denied,* 469 U.S. 1207 (1985). Although in approving a settlement the district court need not undertake the type of detailed investigation that trying the case would involve, it must nevertheless reach well-reasoned conclusions; it may not rest its decision on "mere boilerplate." *Van Horn,* 840 F.2d at 607 (citation omitted).

In analyzing the proposed settlement, several factors must be considered, the most important factor of which is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in the settlement." *Grunin v. International House of Pancakes,* 513 F.2d 114, 124 (8th Cir.), *cert. denied,* 423 U.S. 864 (1975). Other relevant factors include: (1) the complexity, length, and expense of further litigation; (2) the amount of opposition to the settlement; (3) the opinions of the participants, including class counsel, class representatives, and class members; and (4) the extent of discovery completed and the stage of the proceedings. *Van Horn* 840 F.2d at 607; *Grunin,* 513 F.2d at 124; *Holden v. Burlington Northern, Inc.,* 665 F.Supp. 1398, 1407 (D.Minn.1987). In reviewing these factors, the Court is also mindful of the general policy favoring settlement of class actions. *Holden,* 665 F.Supp. at 1405. The factors will be considered below.

*A. The Strength of Plaintiffs' Case Balanced Against the Amount Offered in the Settlement.*

***4** In evaluating this factor, the Court's task is not to reach any conclusions as to the merits of the plaintiffs' case, nor should the Court substitute its opinion for that of plaintiffs' counsel and members of the class. *Holden,* 665 F.Supp. at 1407. Rather, the determination herein generally will not go beyond "an amalgam of delicate balancing, gross approximation, and rough justice." *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 468 (2d Cir.1974). In this case, because the Court has had only a brief exposure to the issues central to the litigation, its determinations necessarily will be approximations.

As discussed *supra,* Part C, the amount offered in the settlement has a face value of 10.7 million dollars, a value, when simple interest is added, of 12,064,332 million dollars, and a maximum estimated value--accepting the estimated market value of the debenture--of over 13 million dollars. Importantly, the debenture's conversion feature not only increases the market value of the debenture, *See* Moosburner Aff., ¶ 6, it also creates the possibility that the total amount of the Settlement could increase beyond the amounts stated herein. *Id.*

Balanced against the amount of the settlement is the strength of the plaintiffs' case against EBP. In their Consolidated Complaint, the plaintiffs alleged a violation of section 10(b) of the 1934 Act, common law fraud, and negligent misrepresentation. Already, the latter two claims have been dismissed, thereby narrowing the grounds upon which the plaintiffs can recover.

The remaining federal securities law claim is both factually and legally complex, in terms of liability, causation, and recoverable damages. These complexities warrant a conclusion that the plaintiffs' case, although strong in many respects, has significant flaws which make the outcome far from certain. The vigorous defense which has been effected in opposition to the plaintiffs' remaining claim is further proof that the plaintiffs would face an arduous journey if the litigation were to continue.

In this case, the Court concludes that the strength of the plaintiffs' case, when balanced against the amount of the settlement, supports approving the settlement. In reaching this conclusion, the Court is mindful of another court's succinct statement of how to view the balance of these factors in this case:

> consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, "[i]t [is] proper to take the bird in the hand instead of a prospective flock in the bush."

*In re King Resources co. Sec. Litig.,* 420 F.Supp.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

610, 625 (D.Colo.1976) (citation omitted).

*B. The Complexity, Length, and Expense of Further Litigation*

The Affidavit of Vance K. Opperman establishes that the factual and legal complexities in this action are legion. Plaintiffs assert that they have a strong case, yet they concede that marshalling the necessary proof will be a long, arduous, and Byzantine process. The Court agrees and finds that it likely that the amount of time necessary to engage in discovery, motion practice, and trial would be significant.

*5 In addition to the complex nature of the claims, the defendants' aggressive--properly so--defense, as evidenced by their initial motions and opposition to merits discovery, Opperman Aff., ¶¶ 24 & 28, indicates that each step of this litigation would fully litigated. [FN13] Although an adversarial tone is common and proper in this type of case, it cannot be denied that such an approach will increase both the length of the litigation and the expenses incurred therein. [FN14] Such costs include both those usually associated with litigation (for example, travel and court reporting services), and other less measurable costs, such as those incurred by EBP as its employees' time is taken up by discovery responses and other litigation-related matters. Avoiding these "costs" of litigation also supports approving the settlement.

*C. The Amount of Opposition to the Settlement*

Under the terms of the March 16, 1993 Order granting preliminary approval to the settlement, the cut-off date for communicating objections to the proposed settlement was May 14, 1993. Plaintiffs represent to the Court that as of this date, not a single objection to the settlement had been received. Although the Court notes that apparently there was a delay in mailing over 90% of the Notice and Proof of Claim forms, *see* Hoyt Aff., ¶¶ 3 & 5, the continued absence of objections to the settlement indicates that the members of the Settlement Class favor approving the settlement.

*D. The Opinions of the Participants, Including Class Counsel, Class Representatives, and Class Members*

The Court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement. *Welsch v. Gardebring*, 667 F.Supp. 1284, 1295 (D.Minn.1987). However, the Court must keep in mind that a potential conflict of interest always exists between an attorney and a class. *Grinnell*, 495 F.2d at 462; *Welsch*, 667 F.Supp. at 1295. Accordingly, the Court may not merely "rubber-stamp" counsel's opinions; rather, its duty to act as guardian of the class requires the Court to carefully consider opinions of counsel. *Welsch*, 667 F.Supp. at 1295.

Counsel for plaintiffs are experienced in the area of securities litigation. Upon careful consideration of counsel's opinion, and in light of their experience and familiarity with this Case and other securities class actions, the Court finds that Counsel's statements in favor of the settlement are credible and support granting the application for final approval of the settlement.

Further, the negotiating process was, by all accounts, conducted at arms- length, complex, and well-joined. Opperman Aff., ¶¶ 46-47. The compromise likely emanating from such settlement negotiations further establishes counsel's credibility; intensive and contentious negotiations likely result in meritorious settlements, rather than collusive ones.

Finally, as noted *supra* Part I.C, no member of the Settlement Class has objected to the proposed settlement, nor has any Settlement Class member submitted a statement concerning same. Hence, the Court must garner class members, opinions by implication: the lack of objection to the settlement indicates that the class members approve of it.

*E. The Extent Of Discovery Completed and the Stage of the Proceedings*

*6 The extent of discovery completed and the stage of the proceedings are important factors to consider because they are indicative of counsel's and the Court's ability to evaluate the merits of the plaintiffs' claims. *Welsch*, 667 F.Supp. at 1297. If the claims can be accurately evaluated, the reasonableness of the settlement can be assessed. *Id.*

Although this settlement was derived when the action was in its early stages, discovery was well under way. Counsel for plaintiffs conducted an intensive investigation into the available facts and some 100,000 pages of documentary evidence were produced by EBP and reviewed by plaintiffs' counsel. In addition, the parties engaged in an initial round of briefing and argument in connection with EBP's Motion to Dismiss However, deposition discovery, both of parties and non-parties (including experts),

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

had not yet been conducted.

The factual investigation conducted to date is sufficiently detailed to support a conclusion that counsel and this Court are capable of evaluating the strength of plaintiffs' case. Counsel's candid admissions concerning the strengths and weaknesses of plaintiffs' claims, *see supra* Part I.A, therefore, reflect analysis and reasoning, rather than mere guess-work. Accordingly, the Court finds that the extent of discovery and the stage of the proceedings support approving the settlement.

*F. Summary of Analysis*

In summary, upon careful consideration of the relevant factors, and keeping in mind the Court's duty to act as a guardian of the plaintiff class, the Court concludes that the settlement agreement is fair, just, and reasonable, and that it is the product of arms-length negotiations, rather than fraud or collusion. Accordingly, the settlement agreement will be approved.

II. Application for Attorney's Fees and Costs

Concurrent with the motion to approve the settlement counsel brought an application for an award of attorney's fees and costs. Specifically, counsel seek an award of thirty-three and one-third percent (33 1/3 %) of the Settlement Fund--i.e., 33 1/3 % of the $4.2 million cash fund and a 33 1/3 % interest in the $6.5 million debenture to be issued by EBP upon entry of final judgment. [FN15] Based upon an assumption that the Settlement Fund will total at least $12,064,332 million, a fee award of 33 1/3 % of the Settlement Fund would total approximately $4 million.

As part of the process of notifying class members of the proposed settlement in this action, plaintiffs' counsel notified class members that counsel would seek an award of attorney's fees from the Settlement Fund, and that counsel would request 33 1/3 % of the total Settlement Fund. Class members were also notified of their right to object to the request for attorney's fees. No member of the Settlement Class has made any objection to the request for attorney's fees.

Plaintiffs' counsel's efforts have resulted in creation of a $10.7 million common fund, plus interest, for the benefit of the class. Under *Blum v. Stenson,* 645 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984), counsel may be awarded a reasonable fee based upon a percentage of the fund. *See In re Bulk Popcorn Antitrust Litig.,* Civ. No. 3-89-710 (D.Minn. Sept. 3, 1992); *In re Wirebound Boxes Antitrust Litig.,* File No. MDL-793 slip op., at 2 (D.Minn. May 2, 1991) (Murphy, J.); *In re Digital Sound Corp. Sec. Litig.,* File No. 90-3533-MRP (C.D.Cal. Apr. 9, 1991).

*7 Based upon a review of cases which have awarded attorney's fees under the "common fund" approach, the Court finds that an award of 33 1/3 % of the common fund is reasonable.

Based upon a careful consideration of plaintiffs' counsel's application, the Court finds that it is reasonable and will be granted. Plaintiffs' counsel have achieved a successful result in this litigation, having amassed a total settlement value of at least $10.7 million in cash and the debenture, exclusive of interest. Counsel achieved this outcome through extensive efforts, in terms of both advocacy and compromise. The Court further notes counsel's willingness to pursue this action, despite its risks, on a contingency basis.

III. Motion for Incentive Payments to Representative Plaintiffs

The parties have also applied for incentive payments of $5,000 to be paid to each of the three class representatives. No member of the Settlement Class has objected to the application.

After considering the representative plaintiffs' roles in this litigation, the public service they have rendered by seeking to enforce the federal securities laws, and the benefit that they have conferred on a large class of purchasers of EBP common stock, the Court concludes that an incentive award of $5,000 to each of the three representative plaintiffs is appropriate. Accordingly, the application for incentive payments will be granted.

Conclusion

Based on the files, records, and proceedings herein, including all materials filed in support of the instant applications, IT IS ORDERED that:

1. plaintiffs' Application for Final Approval of the Settlement (Doc. No. 71) is GRANTED. The proposed settlement shall be, and the same hereby is, approved according to the Stipulation, the definitions,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

terms, and conditions of which are incorporated by reference as though fully set forth herein;

2. pursuant to the Stipulation, the Litigation, *Cohen v. Employee Benefit Plans, Inc.*, Civ. No. 3-92-709, and *Strunk v. Employee Benefit Plans, Inc.*, Civ. No. 3-92-710 are DISMISSED WITH PREJUDICE and without taxation of costs in favor or against any party;

3. all members of the Settlement Class are hereby conclusively deemed to have released (a) Employee Benefit Plans, Inc., a Delaware corporation, and all and each of its predecessors, successors, assigns, direct and indirect subsidiaries, divisions, parents, affiliates and related corporations and entities, and all and each of its and their respective predecessors, successors and assigns and all and each of its and their present and former officers, directors, shareholders (other than members of the Settlement Class) partners, principals, insurers, underwriters, investment bankers, employees, auditors, accountants, attorneys and agents and their respective assigns, successors, agents, representatives, heirs, executors and administrators; and (b) William E. Sagan, Robert P. Brook, and Michael Goran, all and each of them, and all and each of their respective successors, assigns, agents, representatives, heirs, executors, administrators and insurers, with respect to any and all claims, actions, causes of action, rights or liabilities, including Unknown Claims (as defined in paragraph VI.A.11 of the Stipulation), which exist or may in the future exist against any of the defendants by reason of any matter, event, cause or thing whatsoever arising out of, relating to, or in any way connected with (a) the ownership, purchase, sale or other acquisition or disposition during the Class Period of any EBP securities by a member of the Settlement Class; (b) the status of a member of the Settlement Class as a shareholder of EBP during the Class Period; and (3) any of the facts, circumstances, transactions, events, occurrences, acts, omissions or failures to act that are or could have been alleged or referred to in the Litigation, including, without limitation, the announcements made on August 8, 1991; October 15, 1991; December 9, 1991; December 16, 1991; January 9, 1992; January 15, 1992; and February 5, 1992; and the telephone and personal contacts made by personnel or other representatives of EBP, including one or more of the individual defendants, with stock market professional, analysts, money managers and other members of the securities or investment communities;

*8 3. all members of the Settlement Class are hereby permanently enjoined and barred from instituting, asserting or prosecuting, either directly, representatively, derivatively or in any other capacity, any and all claims which members of the Settlement Class, or any of them, had, have or may have in the future have against the defendants, or any of them, arising out of, based upon, or otherwise related to the claims settled under the Stipulation;

4. plaintiffs' counsel's Joint Application for an Award of Attorney's Fees and Costs (Doc. No. 72) is GRANTED. Plaintiffs' counsel shall be, and the same hereby is, awarded attorneys' fees and costs of (1) thirty three and one-third percent (33 1/3 %) of the 4.2 million cash payment made by defendants or on their behalf to the class action escrow account, plus a *pro rata* share of interest earned thereon to date of payment to plaintiffs' counsel, and (2) a 33 1/3 % interest in the $6.5 million debenture to be issued by EBP upon entry of an order of final judgment, plus a *pro rata* share of all interest earned thereon, which interest shall be distributed to plaintiffs' counsel immediately upon payment thereof. Co-lead counsel shall allocate and distribute said amounts among the firms acting as plaintiffs' counsel, pursuant to agreement among them;

5. plaintiff counsel's Application for an Award of Incentive Bonuses for the Named Plaintiffs (Doc. No. 72) is GRANTED. Each of the three named representative plaintiffs shall be, and the same hereby are, awarded five thousand dollars ($5,000) as an incentive award for bringing and assisting in the prosecution of this action on behalf of the class; this sum shall be in addition to any amount of the Settlement Fund to which the named plaintiffs may be entitled to as members of the Settlement Class;

6. TCF Savings Bank fsb, as depository agent, shall forthwith disburse the cash amounts awarded herein in accordance with the written instructions from plaintiffs' settlement counsel, Karl L. Cambronne of Chestnut & Brooks, P.A. and Stanley R. Wolfe of Berger & Montague, P.C. and in accordance with the terms of the Stipulation of Settlement filed herein on March 16, 1993; and

7. the Court hereby retains and reserves jurisdiction over (a) implementation of the settlement and any distribution to members of the Settlement Class who are Authorized Claimants (as that term is defined in paragraph VI.A.13 of the Stipulation) under the terms and conditions of the Stipulation and pursuant to further orders of this Court; (b) disposition of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Settlement Fund under the terms and conditions of the Stipulation and Notice; (c) this action, until (i) the Effective Date contemplated by paragraph VI.A.16 of the Stipulation, which will occur on the date upon which this judgment becomes not subject to further appeal or review, and (ii) each and every act agreed to be performed by the parties shall have been performed pursuant to the terms and conditions of the Stipulation, including the exhibits annexed thereto; (d) this action, for the purpose of implementing distribution to shareholders in accordance with theice; and (e) all parties, for the purpose of enforcing and administering the Stipulation and settlement.

*9 LET JUDGMENT BE ENTERED ACCORDINGLY.

FN1. Acting as counsel for plaintiffs in this action are: Chestnut & Brooks, P.A.; Berger & Montague, P.C.; Opperman, Heins & Paquin; Abbey & Ellis; Goodkind, Labaton, Rudoff & Sucharow; and Wolf, Haldenstein, Adler, Freeman & Herz. Under the terms of Pretrial Order No. 1, which was entered on March 10, 1992, Chestnut & Brooks and Berger & Montague were appointed co-lead counsel for plaintiffs. For purposes of the Court's discussion, all counsel shall be collectively referred to as "plaintiffs' counsel" or "counsel."

FN2. The three original actions were: (1) *Strunk v. Employee Benefit Plans, Inc.*, Civ. No. 3-92-20; (2) *Fecht v. Employee Benefit Plans, Inc.*, Civ. No. 4-92-41; and (3) *Cohen v. Employee Benefit Plans, Inc.*, Civ. No. 3-92-14. Each of these cases was assigned, either originally or as a related case, to Hon. Harry H. MacLaughlin.

FN3. *See* July 27, 1992 Memorandum and Order of Hon. Harry H. MacLaughlin.

FN4. A total of 13,471 copies of both the Notice and Proof of Claim forms were mailed to shareholders and/or nominees. Hoyt Aff. ¶ 5.

FN5. The face value of the settlement, combined with the interest expected to be earned on the debenture, equals a total settlement value of $12,064,332. Based upon plaintiffs' expert valuation of the debenture's market value, *see* Moosburner Aff., the total amount of the Settlement Fund could exceed $13 million.

FN6. TCF Savings Bank fsb, is the depository agent for the escrow account.

FN7. EBP's actual obligation is to pay $1.2 million, less the amount equal to the interest accrued during the period December 16, 1992 to March 16, 1993 on $2.75 million of the insurance carrier's payment.

FN8. The debenture will be senior to EBP's currently outstanding 6 3/4 % convertible debentures.

FN9. The total amount of interest expected to be earned on the debenture is $1,364,332.

FN10. Within 120 days of an entry of an order of final judgment, EBP shall file a registration statement with the Securities & Exchange Commission and use its best efforts to register the shares of EBP common stock issuable upon conversion of the debenture.

FN11. The $40 million cap on debt excludes existing indebtedness or the replacement thereof, and any existing or future letters of credit in any amount for the benefit of EBP or its subsidiaries.

FN12. The "net" settlement proceeds are that portion of the Settlement Fund remaining after payment of plaintiffs' counsel's fees and costs, the incentive awards to the representative plaintiffs, costs for notice and claims administration, escrow fees and costs, costs of tax preparation and payment of any taxes due on the Settlement Fund.

FN13. The Court notes that Plaintiffs' out-of-pocket expenses have already reached the $60,000 plateau.

FN14. Under the pretrial order currently in place, dispositive motions may be brought on or before October 1, 1993. Given that settlement discussions have effectively terminated all discovery, the parties likely would Seek to extend the discovery and motion deadlines, which would further increase the length of the litigation.

FN15. Counsel also seeks a *pro rata* share of all interest earned on the debenture. Counsel requests that it be awarded its

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

interest upon payment thereof; however, counsel requests that the plaintiffs' *pro rata* share be held in an interest-bearing account until the debenture matures, so as to avoid the cost of making multiple payouts to the plaintiff class.

1993 WL 330595 (D.Minn.), Fed. Sec. L. Rep. P 97,669

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

In re Monosodium Glutamate Antitrust Litigation

Civil File No. 00-MDL-1328 (PAM)

**MEMORANDUM AND ORDER**

---

This matter is before the Court on Plaintiffs' Application for Attorneys' Fees. In that Application, Plaintiffs' counsel asks for fees in the amount of 1/3 of the settlement fund, and costs of slightly less than $2 million. The settlement fund stands at $81.4 million plus interest. According to Plaintiffs' counsel, the total fee award they seek is $27.1 million.

The notice to the class about the proposed settlement distribution stated that the attorneys would seek no more than 1/3 of the settlement fund. No class members have objected to the proposed fee award.

**DISCUSSION**

Determining the amount of an award of attorneys' fees is a matter committed to the discretion of the Court. Blum v. Stetson, 465 U.S. 886, 896-97 (1984). The general rule is that "a litigant or a lawyer who recovers a common fund for the benefit of person other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). Because there is a conflict of interest between the attorneys and the class members with respect to apportionment of the settlement fund, a fee request is subject to heightened judicial scrutiny. In re Flight Transp. Corp. Sec. Litig., 685 F. Supp. 1092, 1094 (D. Minn. 1987) (Weiner, J.). The theory behind attorneys' fees awards in class actions is not merely to compensate counsel for their time, but to award

**EXHIBIT J**

counsel for the benefit they brought to the class and take into account the risk undertaken in prosecuting the action.

The Manual for Complex Litigation notes that, in common fund cases, attorneys' fees are generally awarded as a percentage of the fund. See Manual for Complex Litigation, § 24.121 at 188 (3rd ed. 1985). The Eighth Circuit has specifically upheld this approach. Petrovic v. Amoco Oil Co., 200 F.3d 1140, 1157 (8th Cir. 1999). Courts may also use a lodestar approach, first set forth by the Third Circuit. See Lindy Bros. Builders, Inc. v. Am. Radiator & Standard Sanitary Corp., 487 F.2d 161 (3d Cir. 1973); see also Grunin v. Int'l House of Pancakes, 513 F.2d 114 (8th Cir. 1975) (adopting Lindy method of calculating fees). The Manual points out that the Supreme Court has never adopted the lodestar method, and that "[i]n recent years, the trend has been toward the percentage of the fund method." Manual § 24.121 at 189.

**A. Percentage of the Fund**

Most courts applying the percentage-of-the-fund approach award fees in the 25% to 30% range, adjusting up or down for the circumstances of the case. Id. The Manual notes that, where the fund is unusually large, a percentage approach may result in a windfall to counsel. Id. In those cases, courts often determine the fees based on a sliding scale approach, the lodestar, or some combination of lodestar and percentage.

Factors to be considered when determining the amount of the fee award include:

- the size of the fund created and the number of persons benefited [sic];
- the presence or absence of substantial objections by

members of the class to the settlement terms and/or fees requested by counsel;
- the skill and efficiency of the attorneys involved;
- the complexity and duration of the litigation;
- the risk of nonpayment;
- the amount of time devoted to the case by plaintiffs' counsel; and
- the awards in similar cases.

Id. at 190. In this case, the size of the fund is substantial. Indeed, the settlements received from several of the Defendants are more than Plaintiffs' expert's estimate of that Defendants' liability. As noted above, there have been no objections to the settlement or to the fees requested.

The attorneys prosecuted this case very skillfully, often under difficult circumstances. The attorneys took depositions throughout Asia and dealt with highly uncooperative foreign Defendants. The issues in the case are fairly complex antitrust issues, and the case has been pending for almost three years. The Court has been impressed throughout this litigation with the quality of advocacy on both sides. Plaintiffs' counsel points out that, thus far, the class lawyers have spent almost $2 million in expenses in this action, a substantial investment that carried with it the risk that it would never be repaid. Finally, it is clear that the attorneys for the class invested a substantial amount of time on this matter, a fact that is confirmed by the affidavit appended to the Application. Attorney time alone totaled almost 32,000 hours.

The Court is convinced that Plaintiffs' counsel is entitled to a substantial award in the form of a percentage of the settlement fund. In order to determine the proper percentage, however, the Court asked Special Master John Borg to inquire into the figures behind the

lodestar calculations in the affidavit. See, e.g., Petrovic, 200 F.3d at 1157. The lodestar approach is outlined below.

B. Lodestar

"As with percentage fees. An award . . . under the lodestar method should fairly compensate the attorney for the reasonable value of the services beneficially rendered, based on the circumstances of the particular case." Manual § 24.122 at 191. The lodestar calculation first multiplies the number of hours expended with a reasonable hourly rate. Id. The result may then be adjusted either up or down to account for the circumstances of the case. Id. at 192. Some factors courts consider in adjusting the lodestar amount include "the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, the risk of nonpayment, and the delay in payment." Id.

Here, Plaintiffs' counsel has submitted an affidavit summarizing the time spent by each law firm participating in the case. Attorneys spent 31,923.85 hours on the case, paralegals 11,823.35 hours. (Gustafson and Bruckner Aff. ¶ 45.) According to the affidavit, the lodestar for these hours totals $13,960,274.85.

Special Master Borg, at the Court's request, conducted a "spot check" of these numbers. He concluded that the hours billed are reasonable given the complexity of the case and the extensive travel involved. He also concluded that the hourly rates used in calculating the lodestar were not unreasonable, although he noted that some of the rates were on the high end of the scale. Finally, he examined the number of partner hours billed compared with the number of associate and paralegal hours billed, and determined that the breakdown of hours

was reasonable. The Court adopts these conclusions and finds that the lodestar claimed by counsel is reasonable. Under the lodestar method, the total fee award requested amounts to using a multiplier of slightly less than 2 for the lodestar. This multiplier is within the range of multipliers that courts typically use. Thus, the total award requested is reasonable.

C. The Award

The question then becomes what amount will fairly compensate counsel for the time and effort they have invested in this case over the past three years. After careful consideration of the materials submitted, the Court concludes that an award of 30% of the settlement fund is reasonable in this matter. Thus, the Court finds that Plaintiffs' counsel are entitled to an award of $24,420,000, plus the costs claimed in the Application.

CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Plaintiffs' Application for Attorneys' Fees (Clerk Doc. No. 350) is **GRANTED** as set forth above.

Dated: February 6, 2003

Paul A. Magnuson
United States District Court Judge

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE CHRONIMED INC. SECURITIES LITIGATION | Master File No. 01-CV-1092 (DWF/AJB) CLASS ACTION |
| This Document Relates To All Actions | |

STATE OF NEW YORK )
: ss.
COUNTY OF MONROE )

**AFFIDAVIT OF FRANK C. TORCHIO**

I, Frank C. Torchio, being duly sworn, depose and say:

1. I have been retained by Bernstein Litowitz Berger & Grossmann LLP ("Lead Counsel") on behalf of lead plaintiffs, Third Point Partners Management ("Lead Plaintiffs"), and the Class, to estimate damages for the period from October 27, 1999 through June 13, 2001, inclusive (the "Class Period") in the above captioned case.

2. I have estimated the total aggregate damages in the above captioned case to be $14.9 million for approximately 5.7 million damaged shares at an average per-share damages of $2.60, under the assumption that Plaintiffs successfully prove that Defendants are liable under Section 10(b) of the 1934 Securities Exchange Act.

**QUALIFICATIONS**

3. I am the President of Forensic Economics, Inc., located in Rochester, New York. I founded Forensic Economics, Inc. (formerly Dorkey & Associates) in 1989. I have consulted on issues pertaining to financial valuations, regulatory economics, transfer pricing, and financial-

EXHIBIT K

economic analysis, and analyzing the response of stock prices to public information in securities fraud lawsuits for over thirteen years. Forensic Economics has been retained by both plaintiffs and defendants in such securities cases.

4. I hold an MBA in Finance and Economics (1982) from the University of Rochester's William E. Simon Graduate School of Business Administration. I was the 1991 Rosenthal Fellow at the University of Rochester for innovative developments in applying financial-economic theory. I have served on the adjunct faculties at the William E. Simon Graduate School of Business Administration at the University of Rochester (1997 to 1999) and at the Graduate School of Business at Rochester Institute of Technology (1994 to 1996).

5. I have testified on damages in securities fraud lawsuits and I have co-authored an article about the trading models used for estimating damages in securities lawsuits. The article is published in Duke University School of Law's *Law and Contemporary Problems* (Vol. 64, Spring-Summer 2001).

6. I have worked in the commercial insurance industry and in the electric and gas utility industry, where I held positions in the treasury and strategic planning departments. I have passed the Level III examination of the chartered financial analyst (CFA®) program of the Association for Investment Management and Research and I have been awarded the CFA® charter. Exhibit A contains my resume.

**TASKS PERFORMED AND MATERIALS REVIEWED**

7. During the period from June 2002 through July 2003, I and, under my supervision, my associates performed various tasks, principally including:

a. Reviewing pleadings, including the Amended and Consolidated Class Action Complaint;

b. Performing an event study, including running market model regressions to net out the effect of market and industry movements on Chronimed common stock;

c. Reviewing news stories and analyst reports to establish economic evidence of materiality and loss causation;

d. Performing detailed analysis of institutional holdings in Chronimed common stock to calculate the estimated number of damaged shares of common stock held by institutions;

e. Computing the float, including shares outstanding, institutional holdings not traded during the class period, and insider holdings;

f. Estimating aggregate damages for common stock using trading models;

g. Estimating damages for securities with claims pursuant to Section 10(b) of the Exchange Act; and

h. Assisting counsel in preparation for settlement discussions.

**COMPENSATION**

8. My compensation is based on the number of hours worked, as well as out-of-pocket expenses, in addition to any charges incurred by the staff at Forensic Economics, Inc., who work under my direct supervision and direction, for their work in this assignment. My hourly rate is $300. Forensic Economics' hourly rates range from $125 to $300. Exhibit B contains my invoices in this case, including the monthly breakdown of the activities and the time spent. Set forth below are the names of the persons who worked on this matter, the hours expended, the hourly rates, and the fees charged.

| Associate | Hours | $ Per Hour | Total |
|---|---|---|---|
| Frank Torchio | 20.25 | $300 | $6,075.00 |
| Patrick Krenzer | 47.50 | $150 | $7,125.00 |
| Ken Kotz | 0.50 | $175 | $87.50 |
| Michael Bedworth | 0.50 | $125 | $62.50 |
| | | | |
| Expenses | | | $388.80 |
| | | | |
| **TOTAL** | | | $13,738.80 |

**BACKGROUND**

9. Chronimed, Inc. ("Chronimed") is a disease focused drug distribution company serving the prescription drug needs of people with chronic health problems. Chronimed was founded in 1985 by Maurice R. Taylor, II and John Howell Bullion as a Minnesota corporation and has been publicly traded since 1992. Chronimed trades on the NASDAQ Exchange under the symbol CHMD. In 1996, Chronimed acquired StatScript Management Service.

**ESTIMATION OF DAMAGES FOR SHARES OF COMMON STOCK**

10. I calculated Section 10(b) damages suffered by members of the Class who purchased or otherwise acquired Chronimed common stock during the Class Period. To calculate Section 10(b) damages, I first calculated the artificial inflation for each day in the Class Period. I then calculated the number of shares that were purchased on each day of the Class Period and sold later in the Class Period ("in and out" shares), or held through the end of the

Class Period ("retained" shares). Damages per share for the retained shares were calculated as the artificial inflation at the time of purchase. In this matter, there were no damages for the in and out shares because, in my opinion, there is no causal link to investor losses before the corrective disclosure at the end of the Class Period. Damages for retained shares were limited by the damages limitation provision in the Private Securities Litigation Reform Act of 1995. Each of these steps is described below.

**Materiality and Loss Causation**

11. As a general proposition, modern finance theory holds that the market price of a stock depends on the market's expectations regarding future net cash flows to equity holders. In theory, a company's stock price is based on the (risk-adjusted) discounted present value of the net cash flows expected by the market. Therefore, new information that causes the market to significantly alter its expectations of future net cash flows generally will cause a prompt repricing of the stock to reflect the new expectations.[1]

12. Since Fama, Fisher, Jensen, and Roll,[2] financial economists have used event study methodology as a tool to measure the effect on market prices from all kinds of new information relevant to a company's equity valuation. That information includes earnings

---

[1] *See* E. Fama, "Efficient Capital Markets: II," *The Journal of Finance* 46, 1575-1617 (1991); R. Jennings & L. Starks, "Information Content and the Speed of Stock Price Adjustments," *Journal of Accounting Research* 23, 336-350 (1985); J. Patel & M. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13, 243-252 (1984); C. Woodruff & J. Senchack, Jr., "Intradaily Price-Volume Adjustments of NYSE Stocks to Unexpected Earnings," *The Journal of Finance* 43, 467-491 (1988).

[2] *See* E. Fama, L. Fisher, M. Jensen & R. Roll, "The Adjustment of Stock Prices to New Information," 10 *International Economic Review* 1 (1969).

reports, dividend changes, stock-splits, mergers and acquisitions, regulatory rulings and tax legislation. Event study methodology also has been widely used to assess materiality in fraud-on-the-market cases.[3]

13. Generally, two factors must be present to support a finding of materiality based on event studies. First, there must be a public release of new information. Second, there must be a statistically significant return (net of market movements) that is correlated with that release of new information. The determination of a statistically significant return must account for the individual stock's general volatility. If the stock price return is outside of the stock's normal volatility (for a given statistical confidence limit), then the return is said to be "statistically significant," and the price movement is regarded as being material. Event studies start by computing "excess returns," which are the company's stock returns (percentage change in the stock price including dividends) net of market-wide influences.

14. I used event study methodology to identify and isolate the price effect on Chronimed common stock caused by corrective disclosures and inflationary statements that occurred during the Class Period, and that partially or fully revealed the financial impact of the alleged wrongdoing.

---

[3] *See* M. Mitchell & J. Netter, "The Role of the Efficient Markets Hypothesis in Insider Trading and Other Securities Fraud Cases at the Securities and Exchange Commission," *The Business Lawyer*, Vol. 49 (1994); D. Tabak & F. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *NERA Working Paper*, April 1999. *See also In re Gaming Lottery Securities Litigation*, No. 96 Civ. 5567 (RPP), 2000 WL 193125 (S.D.N.Y. Feb. 16, 2000).

*January 4, 2000*

15. According to a Bloomberg News story at 2:31 p.m. on January 4, 2000, Chronimed was rated a "strong buy" at Parenteau Corporation in new coverage by Francois Parenteau.

16. As a result of this new information, Chronimed's stock price increased over 17% to close at $9.1875 on January 4, 2000 on reported volume of 348,400 shares, approximately 5 times the average daily trading volume since the beginning of the Class Period on October 27, 1999. The positive 19.3% excess return is statistically significant at the 99% level.

*November 9, 2000*

17. On November 9, 2000, analyst Eric Veiel at A.G. Edwards & Sons, Inc. initiated coverage of Chronimed and rated the company a "buy" with a price target of $11 per share.

18. Chronimed's stock price increased 18% on November 9, 2000, closing at $7.75 with a reported volume of 106,300 shares, almost 2 times the average daily trading volume since the beginning of the Class Period. The positive 18.5% excess return is statistically significant at the 99% level.

*June 14, 2001*

19. Before the opening of trading on June 14, 2001, Chronimed announced that it intended to adjust reported revenue, earnings and accounts receivable for the fiscal year ended June 30, 2000 and for the three quarters ended March 31, 2001. The Company had concluded that it had previously overstated its revenue, earnings and receivables for those time periods. According to a PR Newswire story at 10:35 a.m. on June 14, 2001, trading was halted on the stock by NASDAQ as it requested additional information on the restatements. Chronimed

eventually clarified its position on June 21, 2001. Trading on the stock resumed on June 22, 2001.

20. When trading resumed on June 22, 2001, Chronimed's stock price dropped approximately 49% to close at $4.74 on reported volume of 1.84 million shares, almost 16 times the average daily reported volume during the Class Period. The negative 48.5% excess return is statistically significant at the 99% level.

21. I attributed two-thirds of the drop on June 22, 2001 to the announcement by the Company and one-third of the drop to the halting of the trading of Chronimed's common stock by NASDAQ on June 14, 2001. I attribute approximately one-third of the total drop solely to the trading halt, which I cannot predict would have occurred had Chronimed provided adequately timely disclosures as alleged by Plaintiffs.

**Damages Per Share**

22. The measure of damages for an investor is generally "the difference between the price and the value on the date of the purchase, or, for plaintiffs who sold their securities before the corrective disclosure, the difference between the price inflation at the time of the purchase and the price inflation at the time of the sale."[4] Price inflation is thus the difference between the price and the true value. Based on the price declines associated with the specific disclosures discussed in the preceding section, and using the event study approach described previously, I estimated the true value line for Chronimed common stock throughout the Class Period.

[4] B. Cornell & R.G. Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," 37 *UCLA Law Review* 883, 886 (June 1990).

23. I utilized a constant dollar approach to determine the true value and artificial inflation in Chronimed's common stock throughout the Class Period. The artificial inflation was based on the excess price decline on June 22, 2001, the first day of trading after the disclosure on June 14, 2001. Working backwards in time from the June corrective disclosure, I reduced artificial inflation to account for the stock price increases on January 4, 2000 and November 9, 2000. In my view, the price would not have increased on these dates had Chronimed corrected the misrepresentations at the beginning of the Class Period. Subtracting the artificial inflation from the closing stock price on each day yields the true value for each day of the Class Period.

24. Thus, from October 27, 1999, the first day of the Class Period, through January 4, 2000, the artificial inflation present in Chronimed's common stock was $0.31 per share. After January 4, 2000, artificial inflation is $1.81 per share through November 9, 2000. The artificial inflation is $3.03 per share from November 10, 2000 until the end of the Class Period.

**Damaged Shares**

25. Because artificial inflation is not constant during the Class Period, it is necessary to estimate the number of shares that were purchased on each day of the Class Period and either sold later in the Class Period (in and out shares) or held through the end of the Class Period (retained shares).

26. Because in practice it is generally not possible to precisely determine the date each individual share was purchased or sold, I used a trading model to simulate the actual trading of each share.[5] The trading model identifies the fraction of volume on each day corresponding to

---

[5] *See* D. Furbush & J. Smith, "Estimating the Number of Damaged Shares in Securities Fraud Litigation: An Introduction to Stock Trading Models," *The Business Lawyer* (February 1994).

shares that are likely to have been purchased on that day and held through the end of the Class Period. I used what is sometimes called a "multi-trader model."

27. Daily trading volume is taken from Bloomberg, a computerized data source. For each trading day, I reduced reported volume on the NASDAQ stock market by 60% to remove trading by Market Makers. This adjustment is necessary because the relevant volume is the volume of trading by the Class. However, volume reported by the exchanges may overstate trading volume by the Class because such reported volume may include trades by dealers and specialists buying from one investor and selling to another. Including such trades would result in double counting. Published research suggests that the factor I used provides a suitable correction.[6]

28. Total reported trading volume for Chronimed during the Class Period is over 47 million shares. Adjusting the total volume to remove specialist trades yields 19 million shares traded during the Class Period.

29. The float is equal to the total number of shares outstanding, less non-traded shares held by insiders and institutions. The float also is adjusted for reported short interest over the Class Period.

30. Based on the trading model and the assumptions discussed above, I computed that there were 5.7 million damaged shares purchased and held through the end of the Class Period,

---

[6] *See* J. Gould & A. Kleidon, "Market Maker Activity in NASDAQ: Implications for Trading Volume," *Stanford Journal of Law, Business, and Finance* (November 1991); R. Weil, M. J. Wagner & P. B. Frank, *Litigation Services Handbook: The Role of Accountant as Expert* (2nd ed. 1995), 44.23.

and 13.3 million in and out shares purchased during the Class Period, for a total of 19 million shares affected by the alleged wrongdoing.

**Chronimed Common Stock Damages**

31. Damages are computed as the difference in artificial inflation when purchased and artificial inflation when sold (or held) multiplied by the estimate of the number of shares that were purchased in the Class Period.

32. The Private Securities Litigation Reform Act of 1995 limits damages for Section 10(b) claims to an out-of-pocket measurement of damages. The out-of-pocket damages limitation for shares held after the 90-day period beginning on the date on which the information correcting the misstatement or omission is disseminated to the market is computed as the price when purchased less the average price of the security during the 90-day period. The out-of-pocket damages limitation for shares sold during the 90-day period is computed as the price when purchased less the average price of the security since the date on which the information correcting the misstatement or omission is disseminated to the market. Multiplying the number of damaged shares by the amount of the damages per share, and applying the limitation on damages set forth in the Private Securities Litigation Reform Act of 1995, yields total common stock damages of $14.9 million.

Frank C. Torchio

Sworn to me this 18th day of
August, 2003

Notary Public

MICHAEL D. BEDWORTH
Notary Public, State of New York
Qualified in MonroeCounty
Reg. No. 01BE6027256
My Commission Expires June 28, 2007